UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| UNITED STATES OF AMERICA | ) |
| --- | --- |
| | ) |
| vs. | ) CAUSE NUMBER 3:09-CR-74(01)RM |
| | ) |
| MARTELL WASHINGTON a/k/a/ | ) |
| MARTELL WASHINGTON-COLEMAN | ) |

OPINION AND ORDER

Late in the morning of April 24, 2009, South Bend Police Corporal Betsy Culp saw a Buick automobile run a stop sign at the intersections of High and Dubail Streets. Cpl. Culp activated the overhead lights on her marked squad car and began pursuit. The Buick ran another stop sign at High and Indiana, turned right onto Dubail Street. The Buick didn't stop, and Cpl. Culp activated her sirens. The Buick slowed, but didn't stop. The Buick's passengers moved about as Cpl. Culp watched. The Buick passed several potential stopping areas, made another right turn, then pulled over near the corner of Dale and Dubail Streets, in front of a yard where eight people stood.

The driver leaned to her right and disappeared from view. The front seat passenger attempted to hand what appeared to be a ball cap through the vehicle's open window to someone in the yard. Officer Culp ordered the people in the yard to stay away from the vehicle. Officer David Johnson arrived on the scene. Officer Culp approached the Buick's driver's window; Officer Johnson was to watch the back seat occupant, who turned out to be Martell Washington. Mr. Washington behaved nervously and completely avoided eye contact with Officer Johnson when

the officer asked his name and asked for identification. The Buick's driver, Brooke Russwurm, provided Officer Culp with her driver's license and registration for the car. The front seat passenger provided identification. Mr. Washington had no identification. Ms. Russwurm told Officer Culp that they had been going to drop off a ball cap.

Cpl. Culp and Ofcr. Maxey returned to Cpl. Culp's squad car. Officer James Maxey arrived and joined them, overhearing that there had been activity in the car as it came to a stop and that rear seat passenger Martell Washington had been acting nervous. Cpl. Culp said she was going to request permission to search the car. Ms. Russwurm denied that there were any weapons in the car, but agreed to allow the search, so the officers asked the occupants to get out of the car. Cpl. Culp patted down the female front seat passengers. Ofcr. Maxey oversaw Mr. Washington, who continued to avoid eye contact and questions. Ofcr. Maxey asked Mr. Washington if he had any weapons, and Mr. Washington said he did not.

Mr. Washington's clothes didn't bulge in any way. Ofcr. Maxey didn't see Mr. Washington make any furtive movements. Mr. Washington was nervous when Ofcr. Maxey asked him to get out of the car, and made no eye contact with Ofcr. Maxey. Mr. Washington wasn't threatening in his words or actions. Ofcr. Maxey didn't know if Mr. Washington had any history of weapons offenses. Ofcr. Maxey decided to conduct a pat-down of Mr. Washington. The pat-down occurred 6 minutes after the Buick stopped. In Mr.

Washington's front left pocket, Officer Maxey felt several small, hard, cylindrical objects that he recognized as bullets. Officer Maxey asked why Mr. Washington had the bullets, but couldn't make out Mr. Washington's response. Officer Maxey took 4 .22 cal. long rifle Remington bullets from Mr. Washington's pocket; another officer asked Mr. Washington if he had a gun for the bullets. The officers handcuffed Mr. Washington — and event that occurred 9 minutes after the Buick stopped — while the car was searched. The officers found a .22 caliber revolver under the front passenger seat, where it easily accessible from the rear passenger-side seat Mr. Washington had occupied. Mr. Washington was arrested and taken to jail, where officers found a fifth bullet, and a small quantity of marijuana, on Mr. Washington's person.

Mr. Washington doesn't challenge the vehicle stop, but contends the patdown exceeded the scope of the investigatory stop. He also contends that the duration of the investigatory stop was unreasonable.

The Fourth Amendment dictates that searches and seizures conducted without a warrant are per se unreasonable, subject to some exceptions. Minnesota v. Dickerson, 508 U.S. 366, 372 (1993). When a police officer sees behavior that the officer reasonably believes is suspicious, the officer may stop the suspicious person briefly to inquire and may pat down or frisk the person to check for weapons if the officer reasonably believes the person is armed and endangers the safety of the officer and others. Minnesota v. Dickerson, 502 U.S. at 372-373 (summarizing the holding of Terry v. Ohio, 392 U.S. 1, 24, 30 (1968)). Such a stop and frisk is reasonable if 1) the stop is based on reasonable suspicion that the

person is committing or committed a crime, and 2) the officer reasonably suspects that the person stopped is armed and dangerous. *See* Arizona v. Johnson, 129 S.Ct. 781, 784 (2009).

The government bears the burden of proving by a preponderance of the evidence that a warrantless search falls within one of the exceptions to the Fourth Amendment. United States v. Baskinski, 226 F.3d 829, 833 (7th Cir. 2000). Otherwise, evidence seized or otherwise obtained through the search must be suppressed. Id. at 834. Evidence obtained from a violation of the Fourth Amendment generally is subject to exclusion at trial as "fruit of the poisonous tree." *See* Nix v. Williams, 467 U.S. 431, 441 (1984); Wong Sun v. United States, 371 U.S. 484 (1963). To be considered fruit of the poisonous tree, "the evidence must be obtained by 'exploration' of the illegality. Evidence obtained by other means 'sufficiently distinguishable to be purged of the primary taint' may not be considered fruit of the illegality." United States v. Gravens, 129 F.3d 974, 978 (7th Cir. 1997) (*quoting* Wong Sun v. United States, 371 U.S. at 488)).

Mr. Washington argues that the Terry pat down conducted on him was unreasonable under the Fourth Amendment. In evaluating the reasonableness of an investigative pat down, the court must determine: 1) "whether the officer's action was justified at its inception;" and 2) whether the officer's action "was reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. at 20)). In the context of a pat down of a passenger during a traffic stop, the officer must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous. Arizona v.

Johnson, 129 S.Ct. at 786-787 (examining Supreme Court precedent regarding pat downs during traffic stops and holding that "officers who conduct routine traffic stops may perform a patdown of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous.") (internal citations omitted).

An officer may have reasonable suspicion to conduct a protective search for weapons on an individual's person where "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Cady v. Sheahan, 467 F.3d 1057, 1062 (7th Cir. 2006) (*citing* Terry v. Ohio, 392 U.S. at 27). The officer must be able to "point to specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant an intrusion." Id. at 21. The court considers the totality of the circumstances when deciding whether there was reasonable suspicion to conduct a search. United States v. Jackson, 300 F.3d 740, 745-756 (7th Cir. 2002) (explaining that this analysis includes the experience of the law enforcement agent, the behavior and characteristics of the suspect, as well as whether the location of hte stop is a high crime area); *see also* United States v. Lawshea, 461 F.3d 857, 859 (7th Cir. 2006) ("When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect."). "Reasonable suspicion does not deal with hard certainties, and 'behavior which is susceptible to an innocent explanation when isolated from its context may still give rise to reasonable

suspicion when considered in light of all of the factors at play.'" <u>United States v. Fiasche</u>, 520 F.3d 694, 697 (7th Cir. 2008) (*quoting* <u>United States v. Baskin</u>, 401 F.3d 788, 793 (7th Cir. 2005)).

The record before the court doesn't disclose what led the officers to a reasonable suspicion that Mr. Washington was armed or dangerous. None of the officers involved was asked why he or she held such a suspicion. Counsel for the government offered some suggestions in final argument on the motion: the Buick did not stop immediately; the Buick seem to speed up after the first turn; the driver seem to disappear from site upon stopping; the passenger's hand came out of the front window; movement was seen in the car; Mr. Washington appeared to be nervous. Such observations might lead and experienced police officer, such as those involved in this stop, reasonably to suspect the rear seat passenger was armed and dangerous. But none of the officers explained why that was so, or even said that it was so.

The court cannot find, on this record, that the officers had grounds for reasonable suspicion that Mr. Washington was armed or dangerous. Without such a finding, the patdown of Mr. Washington cannot be held to have been a reasonable part of an investigatory stop. The court must suppress the evidence found during that patdown, as well as the evidence found in the jail as a result of the arrest following the patdown.

The court GRANTS the defendant's motion to suppress (doc.#14).

SO ORDERED.

ENTERED:  August 17, 2009

     /s/ Robert L. Miller, Jr.
Chief Judge
United States District Court